1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                                                          **19-CR-1991JB**

**ANTONIO CARRILLO,**

    **Defendant.**

## DEFENDANT ANTONIO CARRILLO'S REPLY SUPPORTING HIS OPPOSED MOTION TO DISMISS INDICTMENT

Defendant Antonio Carrillo, by and through undersigned counsel, Marshall J. Ray, and pursuant to Fed. R. Crim. P. 12(b), submits this Reply supporting his Opposed Motion to Dismiss Indictment. In its response, the United States largely ducks the questions raised in Mr. Carrillo's Motion. For example, instead of conceding, as it must, that the Indictment fails to include essential elements without which a conviction cannot be sustained, the Government posits that the missing elements can be implied or read into the current Indictment. Their argument in favor of implying the missing elements is not persuasive. As for the constitutional defects in this prosecution, the Government relies on a gloss of the statement at issue because it knows that the actual statement, word-for-word, is constitutionally protected speech. It is much easier for the Government to defend its prosecution of the straw man version of the Facebook post. The Court, however, must address the Facebook post head on.

**I.      THE COURT CANNOT PROPERLY IMPLY ESSENTIAL ELEMENTS OTHERWISE MISSING FROM AN INDICTMENT.**

The Court need look no further than the Tenth Circuit's Pattern Criminal Jury Instructions to dispel the Government's argument that the constitutionally required scienter elements may be

omitted from the indictment.    The relevant pattern instruction sets forth the elements as follows:

(1) The defendant knowingly transmitted a communication containing a threat to…injure the person of another;

(2) The defendant transmitted the communication with the intent to make a threat, or with knowledge that the communication will be viewed as a threat; and

(3) The communication was transmitted in interstate or foreign commerce.

A 'threat' is a serious statement expressing intent to instill fear, which, under the circumstances, would cause apprehension in a reasonable person, *as distinguished from mere political argument, idle talk, exaggeration, or something said in a joking manner*. It is not necessary that the defendant intended to or had the ability to carry out the threat." *Criminal Pattern Jury Instructions for the U.S. Court of Appeals for the Tenth Circuit*, 2011 Edition, updated February 2018, Committee on Pattern Jury Instructions of the Judicial Council of the Tenth Circuit. The Indictment fails to allege that Mr. Carrillo intended to make a threat or that he had knowledge that the communication would be viewed as a threat.    The Indictment is therefore fatally defective and must be dismissed.    An amendment is not an appropriate option.    All of elements "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt."    *Jones v. United States*, 526 U.S. 227, 232, 119 S. Ct. 1215, 1219, 143 L. Ed. 2d 311 (1999). The standard articulated in *Jones* for criminal charging is simply not met here.

II.   **THE UNITED STATES' CHARACTERIZATION OF THE FACEBOOK POST AT ISSUE IS A STRAW MAN THAT OBSCURES RATHER THAN HELPS THE COURT'S ANALYSIS.**

In its response brief, the United States carefully avoids quoting the Facebook message for which it has chosen to prosecute Mr. Carrillo.    Instead, the United States bases its arguments on a gloss of the post that is more suitable to the theory of prosecution.    Thus, the Government states in

3

its brief: "Defendant argues second that a threat to burn down buildings, hide the bodies of those killed by arson using farm implements, and thereby participate in a Physical Civil War, cannot be a "true threat" as contemplated by 18 U.S.C. § 875(c), but must rather be considered protected political speech."  Doc. 47 at 2.   In contrast to the aggressive interpretation adopted by the Government, the text of the post reads: "You Bitches Want a Physical Civil War.. I'm Game..I'll bring My Farm Implements and They will Never find your Bodies..AND for Fun I'll BURN Every ACLU Office in the State.. GO TRUMP GO.!"  *See* Doc. 3 at 6.   The Government leaves out important context to make its strained reading work.   For example, the post was not directed at the ACLU or any of its staff.   It was instead part of a comment thread with others.   As the Court can plainly see in Doc. 3 at 6, the screen shots of the Facebook and Twitter posts contain not devices to direct the posts to the ACLU or its personnel. In other words, the ACLU is not tagged in the post or referenced with an "@" symbol or a "#" (hashtag).   This means that the author of the posts was speaking to other people about the ACLU.   These facts are problematic for the United States because they demonstrate that the Facebook post contains not threats to any individuals, but rather heated political rhetoric, including reference to potential civil war.   The post cannot be reasonably interpreted to mean that the speaker is actually planning to kill any persons by way of arson, much less any ACLU staff.

It is widely known that "civil war" is often discussed in current political debates given the hyperbolic and volatile nature of modern politics.   Civil war references have become somewhat of a meme in on-line political banter.   Commentators across the spectrum have written about this phenomenon.   For example, the New Yorker Published this criticism after President Donald Trump retweeted a prediction of civil war:

> Trump returned to the topic of the Civil War yet again last weekend, when he tweeted a quote from a Baptist pastor's statement that to impeach Trump would render a

4

> "Civil War like fracture in this Nation from which our Country will never heal." Hyperbole is Trump's native tongue, but, even by that standard, it was a wildly grandiose claim to argue that not only would his impeachment echo throughout the nation a hundred and fifty-four years from now but also that American politics would continue to grapple with the implications of who stood on which side of the question, and museums and entire fields of scholarship would be devoted to helping the country understand the roots of such a catastrophe.

Cobb, Jelani, Why Trump, Facing Impeachment, Warns of Civil War, New Yorker (October 15, 2019) (Attached as **Exhibit A**). In another article, Newsweek reported that the former RNC Chairman Michael Steele weighed in negatively on the discussions of civil war surrounding Donald Trump:

> Former Republican National Committee (RNC) chair Michael Steele slammed conservatives who have warned of a "civil war" if President Donald Trump were to be impeached and removed from office.
>
> At the end of September, Pastor Robert Jeffress threatened on Fox News that if Congress were to successfully remove Trump from office: "It will cause a Civil War like fracture in this nation from which our country will never heal." Trump tweeted the quote at the time, drawing criticism from numerous pundits, Democrats and even some leading Republicans. But other conservative commentators and politicians have made similar remarks in the intervening weeks.
>
> "I don't know what the hell is wrong with these people," Steele said Saturday on MSNBC. "I think we just need to be straight up about it and just call them out...This is something they want. This is something they are perpetuating through their language and tweets."

Lemon, Jason, Ex-RNC Chair Blasts Threatening 'Civil War' If Trump Impeached: 'Are You Freaking Kidding Me?', Newsweek (November 3, 2019)(https://www.newsweek.com/ex-rnc-chair-michael-steele-blasts-republicans-threat-civil-war-trump-impeachment-1469451) (last retrieved December 30, 2019) (**Exhibit B**). Reuters recently published:

> "#CivilWar2" trended on Twitter in September after Trump quoted a pastor in a Twitter post saying it would "cause a Civil War like fracture" in the United States if he were removed from office. . . . Violent rhetoric about an impending civil war is on the rise, said J.J. MacNab, a fellow specializing in anti-government extremism at George Washington University's Program on Extremism. "It used to be just the militia guys saying this stuff, and now it's gone totally mainstream," she said.

5

Harte, Julia, Trump Tweet, Political Divisions Fuel Rising Discourse About New U.S. Civil War, Reuters (October 29, 2019)(https://www.reuters.com/article/us-usa-civil-war/trump-tweet-political-divisions-fuel-rising-discourse-about-new-u-s-civil-war-idUSKBN1X812B) (last retrieved December 30, 2019) (**Exhibit C**).

Even before Donald Trump's September 30, 2019 tweet about the civil war statement, major media sources recognized that the civil war was gaining traction as a rhetorical device in the political forum.  The Washington Post reported on March 19, 2019 that Iowa Congressman Steve King posted the following meme on his official campaign Facebook page:



The Washington Post was critical, but noted: "Observers pilloried [King] for the post, which many saw as further provocation in a divisive political climate that has *already seen signs of civil war rhetoric creeping into the discourse*."   Thebault, Reis, Steve King Posts Meme Warning that Red States Have '8 Trillion Bullets' in Event of Civil War, Washington Post (March 19, 2019)(https://www.washingtonpost.com/politics/2019/03/18/steve-king-posts-meme-warning-that-

6

red-states-have-trillion-bullets-event-civil-war/)(last retrieved December 31, 2019)(**Exhibit D**). Media sources such as those cited above leave no doubt that that heated, violent-sounding political rhetoric is "mainstream" and is frequently tied to the notion of civil war.

In this context, the Facebook post attributed to Mr. Carrillo is not particularly inflammatory, especially given that, on its face, it does not direct any threats at any persons. The most honest reading is that the post states what the speaker would do in the event of a civil war. This is no more of a threat than the "8 trillion" bullets meme posted by a sitting congressman a few months before the posts in question in this case. No imminent action was threatened. A statute that criminalizes such mainstream rhetoric is unconstitutionally vague and overbroad. "In the first Amendment context … a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 130 S.Ct. 1577, 1580 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)).

Indeed, the Supreme Court of the United States has expressly held that hyperbolic rhetoric is protected under the First Amendment. For example, in *Watts v. United States*, the Supreme Court rejected the federal criminal prosecution of an individual who stated at a political rally:

> They always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. ***If they ever make me carry a rifle the first man I want to get in my sights is L.B.J***. They are not going to make me kill my black brothers.

394 U.S. 705, 706, 89 S. Ct. 1399, 1401, 22 L. Ed. 2d 664 (1969) ("emphasis added). Based on this utterance, the speaker had been charged and convicted by a jury of violating a 1917 statute which prohibited any person from knowingly and willfully making any threat to take the life of or to inflict bodily harm upon the President of the United States. *See id*. at 705. In a per curium decision, the

Supreme Court reversed the conviction. According to the Supreme Court:

> We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term. For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen [sic], and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The language of the political arena, like the language used in labor disputes, *see Linn v. United Plant Guard Workers of America*, 383 U.S. 53, 58, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966), is often vituperative, abusive, and inexact. We agree with petitioner that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.'

*Watts v. United States*, 394 U.S. at 708.

Based on its analysis that the speech was protected, the Supreme Court ordered the lower court to vacate the conviction and enter a judgment of acquittal in favor of the defendant. A jury conviction for the speech at issue in this case similarly could not survive a defense motion for directed verdict because the statement at issue is protected political speech. The only legally significant difference between the speech in this case and that in Watts is that the statement in Watts actually involved a specific statement targeting a person—Lyndon B. Johnson. Ironically, while the petitioner in *Watts* was wrongfully prosecuted for a remark hostile to the President of the United States, in this case, Mr. Carrillo is facing a felony conviction for a comment *supportive* of the President of the United States.

The Facebook post here similarly happened in the context of an obviously heated political discussion and constituted a statement of support towards the President of the United States. Moreover, the statement is even less caustic than that of the petitioner in *Watts*, because it does not identify a single specific person as a target of any violent acts and depends on the eventuality of a "physical civil war." The post on Twitter (which triggered this investigation and was well known to authorities) was entered within minutes of the Facebook post and also explicitly stated "when

8

civil war starts.. I am going to burn down EVERY ACLU office in New Mexico.." ACLU personnel are the ones who complained about the posts and are being cast as the victims here, yet not one statement can be shown as tagging or being directed at the ACLU. Even the notion of burning down every ACLU office in the State is most reasonably read as an impossible-to-implement hyperbole (leaving aside the fact that even a "true threat" to burn ACLU buildings would not violate 18 U.S.C. § 875, because that statute requires threats to a "person").    The commonality of "civil war" rhetoric in the context of Donald Trump's presidency underscores the political nature of the speech. Influential political figures from the President on down to other prominent Republicans have employed the rhetoric of oncoming civil war, so it is no surprise that others will adopt similar talking points.

In a recent high-profile decision, United States District Court Judge the Honorable J. James Otero dismissed the defamation lawsuit brought against Donald Trump by Stephanie Clifford (i.e. Stormy Daniels) because the offending utterance, a Twitter post by the President, amounted to constitutionally protected "rhetorical hyperbole." *Clifford v. Trump*, 339 F. Supp. 3d 915, 926 (C.D. Cal. 2018) ("The United States Constitution protects statements that cannot reasonably be interpreted as stating actual facts about an individual made in debate over public matters in order to provide assurance that public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of the United States.").

The tweet at issue in *Clifford v. Trump* expressed: "A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!" *Id*. at 926 (internal quotation marks omitted).    According to Judge Otero: "Mr. Trumps tweet constitutes 'rhetorical hyperbole,' which is "'extravagant exaggeration [that is] employed for rhetorical effect.' " *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App. 2015) (quoting *Am. Broad. Cos. v. Gill*, 6 S.W.3d

19, 30 (Tex. App. 1999)).&quot; *Clifford v. Trump*, 339 F. Supp. 3d 915, 926 (C.D. Cal. 2018).  The standards for criminalizing political speech should be even more stringent than the ones in existence for permitting defamation lawsuits by public figures or related to matters of public concern.

Given the robust protections courts have implemented in the arena of political rhetoric, the current prosecution is irreparably flawed.  The constitution does not allow a person in Mr. Carrillo's shoes to be made a criminal because of the statements before the Court in this case.

### III. CONCLUSION.

As Mr. Carrillo indicated in his Motion, the Indictment in this case fails to plead essential elements and is therefore fatally defective.  Furthermore, the speech upon which the government relies to bring this criminal case is, on its face, constitutionally protected political speech containing nothing more than rhetorical hyperbole, which courts have long protected from criminal prosecution. Dismissal is therefore required in this case.

WHEREFORE, Defendant Antonio Carrillo respectfully requests that the Court dismiss the Indictment and that it order whatever other relief the Court deems appropriate.

Respectfully Submitted,

LAW OFFICES OF MARSHALL J. RAY, LLC

/s/ *Marshall J. Ray*
Marshall J. Ray
201 Twelfth St. NW
Albuquerque, NM 87102
(505) 312-7598

**CERTIFICATE OF SERVICE**

I hereby certify that on the 31st day of December 2019, I filed the foregoing pleading via CM-ECF, causing all registered parties to be served.

10

/s/ *Marshall J. Ray*
Marshall J. Ray